IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

DIANE O. MOORE                  )
                                )
v.                              )    No. 1:05-0048
                                )    Judge Wiseman/Bryant
JO ANNE B. BARNHART, Commissioner )
of Social Security              )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

**REPORT AND RECOMMENDATION**

        This is a civil action filed pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), to obtain judicial review of the final

decision of the Commissioner of Social Security denying plaintiff

disability insurance benefits ("DIB"), as provided under Title II

of the Social Security Act ("the Act"), as amended.  This case

was transferred to the docket of the undersigned by order entered

August 29, 2006 (Docket Entry No. 21).  The case is currently

pending on plaintiff's motion for summary judgment (Docket Entry

No. 15), which the undersigned construes as a motion for judgment

on the administrative record (see Docket Entry No. 12).

Defendant has filed a response to plaintiff's motion (Docket

Entry No. 20).  For the reasons stated below, the Magistrate

Judge recommends that plaintiff's motion for judgment be GRANTED,

and that the decision of the Commissioner be REVERSED and the

cause REMANDED for further administrative proceedings, to include

updating the medical record, ordering a consultative examination

1

if necessary, and rehearing of the matter.

## I.  Introduction

        Plaintiff filed her DIB application on December 20, 2002, with a protective filing date of December 4, 2002 (Tr. 50-53).  Plaintiff originally alleged the onset of disability as of December 1, 1996 (Tr. 22), citing migraines, shoulder surgeries, and low back pain (Tr. 61-69).  Plaintiff subsequently amended her alleged onset date to February 1, 2002 (Tr. 493-94).  Plaintiff's application was denied at the initial and reconsideration stages of state agency review (Tr. 22-28, 31-32).  She thereafter requested and received a hearing before an Administrative Law Judge ("ALJ").  The hearing was held on September 9, 2004, with plaintiff, her husband, and an impartial vocational expert ("VE") testifying (Tr. 487-525).  Plaintiff was represented by counsel at the hearing.

        On January 14, 2005, the ALJ issued a written decision denying plaintiff's claim (Tr. 13-17).  The ALJ made the following findings:

1.  The insured status requirements of the Social Security Act were met as of the alleged onset date.

2.  No substantial gainful activity has been performed since the alleged onset date.

3.  The claimant has "severe" impairments including: migraines, lumbar degenerative disc disease and residuals of bilateral shoulder surgery.

Case 1:05-cv-00048   Document 22   Filed 01/16/07   Page 2 of 30 PageID #: 68

4.  No impairment or combination thereof meets or equals
    the disability requirements of an impairment listed at
    Appendix 1 to Subpart P, 20 CFR Part 404.

5.  The subjective allegations are not credible.

6.  The claimant retains the residual functional capacity
    for the range of sedentary work described in the body
    of the decision.

7.  The claimant has past relevant work as a retail
    department manager (medium, skilled), audit clerk
    (sedentary, skilled), office clerk (light,
    semiskilled), hand packager (medium, semiskilled), and
    cashier checker (medium, semiskilled).

8.  The Administrative Law Judge found that the claimant
    can perform her past relevant work as an audit clerk.

9.  The claimant is an advanced age individual.

10. The claimant has a high school education.

11. The claimant has not been under a disability through
    the date of this decision.

(Tr. 16-17).

On May 16, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 5-7), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

3

## II.  Review of the Record

### A.  <u>Hearing Testimony and Other Evidence</u>

Plaintiff was born on March 23, 1946 (Tr. 13, 22), making her 58 years old at the time of the ALJ's decision (Tr. 13, 492).  Plaintiff has a high school education and past relevant work as a retail department manager, audit clerk, office clerk, hand packager, and cashier checker (Tr. 13, 62, 67, 93-100, 492-498).

Plaintiff testified that she was unable to stand for more than thirty-five to forty minutes, walk for more than twenty to twenty-five minutes, could sit for only fifteen to twenty minutes at a time and could not squat with her knees (Tr. 15, 503-505).  In terms of activities of daily living, she was able to drive occasionally, though to do so caused pain; she could occasionally walk for 15-20 minutes, visit with her friends, visit her mother in the nursing home, do laundry (except heavy jeans), and cook.  She was able to attend family reunions in Georgia and Alabama, until the last two reunions prior to her hearing, when the drive and her pain kept her from going (Tr. 15, 88-91, 104, 512-513).  Plaintiff lived with her husband, who helped her with most daily tasks (Tr. 104, 512).

Testifying as an impartial vocational expert at the hearing on September 9, 2004, Gary Sturgill, Ph.D., was asked to

4

consider the availability of sedentary[1] work for an individual
with plaintiff's age, education, and past work experience, with a
sit/stand option; occasional climbing of ramps and stairs;
occasional balancing, stooping, kneeling and crouching with no
crawling; never climbing ladders, ropes or scaffolds; occasional
reaching above the shoulders; frequent reaching in all other
directions; no exposure to hazards; and occasional exposure to
fumes, odors, dust, gases and poor ventilation (Tr. 517, 523).

    The VE responded that an individual with plaintiff's
residual functional capacity and work experience could perform
her past relevant work as an audit clerk as generally performed
in the national economy (Tr. 16, 521-523).

                        B.  <u>Medical Evidence</u>

    The medical evidence of record reflects that plaintiff
sought treatment for migraine headaches, esophageal ulcer,
gastroesophageal reflux disease (GERD), lower back pain, and torn
right rotator cuff and repair (Tr. 111-126, 127-275, 277-313,
314-329, 332-341, 386-404, 421-432).  Plaintiff has a
longstanding treatment history with general practitioner, Dr.
Nancy Armetta (Tr. 371-391, 448-465), orthopedist, Dr. Jeffrey
Adams (Tr. 353-369), Southern Physical Therapy (Tr. 332-340, 434-
447), and neurologist, Dr. Diana Talpos-Reed for migraines (Tr.

---

[1]Sedentary work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers and small
tools.  20 C.F.R. § 404.1567(a).

5

314-329).

Dr. Adams initially treated plaintiff for a partial right rotator cuff tear in March 1997 (Tr. 428). Conservative treatment of physical therapy and medication were prescribed prior to the mini-open rotator cuff repair on May 27, 1997 (Tr. 421-428). Following surgery, Dr. Adams noted that plaintiff made good progress, had good rotator cuff strength, and had excellent motion of her shoulder. Dr. Adams released plaintiff from his care on October 13, 1997 with restrictions to do no work above shoulder level on a frequent basis, and no repetitive heavy lifting greater than twenty pounds (Tr. 424-425). Plaintiff continued to follow-up with Dr. Adams for occasional right shoulder pain. On September 10, 1998 and March 11, 1999, Dr. Adams gave plaintiff injections which provided significant relief (Tr. 421-425).

On March 9, 2000, Dr. Talpos-Reed saw plaintiff in follow-up for her severe migraines which had required treatment with methadone, a narcotic drug for relief of severe pain.[2] At that visit, Dr. Talpos-Reed also noted plaintiff's complaint of tremors in the right hand over the last month and a half (Tr. 315). On June 29, 2000, Dr. Talpos-Reed examined plaintiff and noted that, with her history of severe migraines, she had been doing a lot better. Dr. Talpos-Reed further noted that the

_____

[2]http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682134.html.

migraines were associated with plaintiff's menstrual cycle and the prescription drug Amerge was helpful (Tr. 314). The neurological exam showed plaintiff to have a fine tremor on finger-to-nose testing which did not severely interfere with her activities of daily living, but which caused difficulty with feeding herself and writing neatly. Dr. Talpos-Reed diagnosed plaintiff with a migraine and essential tremor.[3] Samples of Mysoline were provided to help the tremor and a follow-up was scheduled for three months. (Id.).

On August 31, 2000, plaintiff sought treatment from Dr. Armetta for pain in the top of her left arm. Plaintiff stated that she bumped it on a rack at work on August 13, 2000. Dr. Armetta examined plaintiff and found her to have decreased range of motion (ROM) of the left shoulder and left elbow tendinitis. Plaintiff was prescribed Inderal,[4] Premphase for menopausal symptoms, Phenergan and Amerge for migraines, Reglan for gastroesophageal symptoms, and the muscle relaxant Flexeril for the pain. She was referred to see Dr. Adams (Tr. 386).

_____

[3]A common usually hereditary or familial disorder of movement that is characterized by uncontrolled trembling of the hands and often involuntary nodding of the head and tremulousness of the voice, that is exacerbated by anxiety and by activity, that is not associated with Parkinson's disease or any other known disease, and that responds to treatment with propranolol. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=essential%20t remor. Plaintiff had already been taking propranolol (under the trade name Inderal) in treatment of her migraines.

[4]Trade name for the drug propranolol, which is used to relax blood vessels in the treatment of high blood pressure, migraine headaches, and tremors. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682607.html.

7

Plaintiff obtained subsequent refills for Flexeril in September 2000 and October 2000 (Tr. 385).

Dr. Adams examined plaintiff on September 8, 2000 for her left shoulder injury (Tr. 418-420). Dr. Adams noted that plaintiff had done well with her prior right shoulder surgery. X-rays of the shoulder were negative. Based upon physical exam, Dr. Adams suspected a rotator cuff tear and ordered an MRI. (Id.). The MRI, taken on October 13, 2000, showed no evidence of a complete supraspinatus tear, but did show an area consistent with impingement or partial tear (Tr. 419). Plaintiff returned to Dr. Adams on October 16, 2000, when he found plaintiff to have good motion of her neck, limited motion with internal and external rotation of her shoulder, and good strength on testing the rotator cuff (Tr. 418). Dr. Adams opined that plaintiff had a partial rotator cuff tear with adhesive capsulitis[5] in her left shoulder. Treatment included an intra-articular injection and physical therapy. (Id.).

Plaintiff received physical therapy from Southern Physical Therapy beginning on October 19, 2000 (Tr. 334-335). Physical therapist, Bill Mastalerz, reviewed plaintiff's information and determined that with treatment, her rehabilitation potential was good (Tr. 335). Plaintiff reported

---

[5]Also known as "frozen shoulder," a shoulder affected by severe pain, stiffness, and restricted motion. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=frozen+shoulder.

feeling good by mid-November (Tr. 338-340). By November 13, 2000, Dr. Adams noted that plaintiff was doing better with her left shoulder. The injection may have helped, and the therapy was definitely helping (Tr. 418, continued at Tr. 363)[6]. Dr. Adams found that plaintiff continued to display fairly poor motion of the left shoulder, but improved strength. He ordered continued physical therapy for 4 weeks, hoping to avoid surgical intervention (Tr. 363). On December 7, 2000, plaintiff was discharged from physical therapy to a home exercise program (Tr. 332). The report stated that she had met her therapy goals and was feeling good. On December 11, 2000, Dr. Adams noted that plaintiff was doing markedly better, was pleased with her progress, and was back to full work duty with no problems (Tr. 363). He found excellent shoulder motion and improving strength, and released plaintiff to follow up only as needed. (Id.).

Plaintiff returned to Dr. Armetta in January 2001 complaining of menstrual symptoms, as well as hand tremors (Tr. 384). Dr. Armetta diagnosed intentional tremor,[7] noting Dr. Talpos-Reed's diagnosis and treatment of the tremor. After

---

[6]The jumbled reproduction of Dr. Adams' treatment notes led the government to mistakenly chronicle plaintiff's release from the doctor's care and return to full work duty one month prior to her left shoulder surgery (Docket Entry No. 20 at 7-8), when in fact these events occurred a year and a month prior to the surgery.

[7]A slow tremor of the extremities that increases on attempted voluntary movement and is observed in certain diseases (as multiple sclerosis) of the nervous system. http://www2.merriam-webster.com/cgi-bin/mwmednlm.

9

observing plaintiff's tremors and muscle tightness, Dr. Armetta "wonder[ed] about some level of Parkinsonism," but deferred to the neurologist's treatment of these symptoms.  (Id.).  Nine months after being discharged from physical therapy and released by Dr. Adams, plaintiff returned to Dr. Armetta for treatment of her left shoulder symptoms on August 23, 2001.  Dr. Armetta prescribed the muscle relaxant Robaxin per plaintiff's request for pain medication and to help her sleep.  Plaintiff was referred back to Dr. Adams (Tr. 380).

Plaintiff returned to Dr. Adams in September 2001 (Tr. 362-363).  Dr. Adams noted that plaintiff's pain had started again three months prior, and had progressively worsened.  Although an examination showed limitation of motion, she had good strength.  Dr. Adams opined that plaintiff still had adhesive capsulitis and a partial rotator cuff tear in her left shoulder.  Dr. Adams recommended a repeated injection and another course of therapy (Tr. 446).  He further noted that although plaintiff was currently working full duty, she had a time limitation because her insurance was going to run out in eighteen months.  Although Dr. Adams wanted to try conservative treatment, he noted that he would not drag the process out too long so plaintiff could get everything done while she remained insured (Tr. 362-363).

Plaintiff returned to Southern Physical Therapy on September 17, 2001 (Tr. 437-441).  Bill Mastalerz reviewed

10

plaintiff's information again and determined that with treatment her rehabilitation potential was good (Tr. 439-440). On October 15, 2001, plaintiff reported that she felt better, had met her therapy goals, and was discharged from physical therapy (Tr. 436).

Plaintiff obtained additional treatment from Dr. Adams in October 2001 (Tr. 362). In October, Dr. Adams noted that although plaintiff continued to have pain over her left shoulder, she maintained her motion very well and had good strength during rotator cuff testing. Plaintiff stated that the injection helped her a fair amount. Dr. Adams recommended arthroscopy with subacromial decompression and AC resection. Plaintiff asked to postpone the surgery until after the holidays (Tr. 362).

Preoperative x-rays and laboratory tests were conducted on January 22, 2002 (Tr. 366-369). X-rays of the chest showed old calcified granulomatous disease and no evidence of acute cardiopulmonary process (Tr. 366).

On February 1, 2002, Dr. Adams operated on plaintiff's left shoulder (Tr. 343-345). During surgery, Dr. Adams decided not to open or do anything to the very small partial cuff tear (Tr. 343). Postoperatively on February 11, 2002, Dr. Adams found that plaintiff had done well and made good progress (Tr. 361). He recommended that plaintiff continue therapy and work on range of motion and strengthening. (Id.).

11

Plaintiff returned to Southern Physical Therapy on February 4, 2002 (Tr. 434-435, 442-445, 447). Upon evaluation and treatment, Bill Mastalerz again determined that plaintiff's rehabilitation potential was good (Tr. 435). Plaintiff felt better by February 7, 2002, and continued to improve and achieved full ROM on March 7, 2002 (Tr. 442-445).

Six weeks postoperatively, on March 13, 2002, Dr. Adams found that plaintiff had done fairly well with her shoulder and that she had very few problems. On examination, Dr. Adams noted that plaintiff had excellent motion of her shoulder and good strength during rotator cuff testing. Dr. Adams authorized plaintiff to return to work with the restrictions of no vacuuming or working overhead. Dr. Adams opined that plaintiff "should be able to do the remainder of her jobs." (Id.).

On April 24, 2002, Dr. Adams found that plaintiff was "still doing very well with very few problems, just occasional soreness." An examination showed plaintiff to have excellent motion of the shoulder and good strength during her rotator cuff testing. Dr. Adams released plaintiff with the permanent restrictions of no vacuuming or overhead lifting greater than ten pounds (Tr. 360).

On June 7, 2002, plaintiff contacted Dr. Armetta regarding migraine induced nausea and increased stress due to her mother being in an assisted living facility. Dr. Armetta

12

prescribed Paxil for plaintiff's stress (Tr. 378).

Dr. Armetta saw plaintiff on October 8, 2002, concerning pain in her lower back, hip and knee, migraines and nausea. Dr. Armetta opined that plaintiff had polyarthritis, migraine syndrome, and right knee swelling. She further noted that plaintiff had an appointment with Dr. Adams and Dr. Jain for pain management (Tr. 375).

On October 18, 2002, plaintiff returned to Dr. Adams for back pain and follow-up treatment. Dr. Adams' examination revealed that plaintiff had tenderness over her lower back, pain with straight leg raising on both legs, good strength and symmetric reflexes. X-rays of plaintiff's back were negative, the hips and sacroiliac joints looked normal. Dr. Adams diagnosed plaintiff with discogenic back pain and scheduled her for an MRI (Tr. 359).

The MRI of the lumbar spine was conducted on October 23, 2002 (Tr. 364-365). Dr. Jerry Brown found that the spinal alignment was normal, and disc space, height and vertebral body height were well maintained at all levels. Although there was a mild annular bulge at L4-5, there was no herniated nucleus pulposus (herniated disc) or spinal stenosis. (Id.).

Plaintiff returned to Dr. Adams after the MRI on November 1, 2002 (Tr. 358). During examination, plaintiff had some tenderness over her lower back, pain with straight leg

13

raising, and fairly significant pain with popliteal compression.[8]
Dr. Adams noted that plaintiff had good strength and symmetric
reflexes.  Dr. Adams diagnosed discogenic back pain and
recommended an epidural steroid injection for relief of
plaintiff's symptoms.  (Id.).

On November 12, 2002, Dr. Armetta treated plaintiff for
a sinus infection prior to the scheduled epidural (Tr. 374).  On
November 27, 2002, Dr. Christopher Ashley performed an L4-5
epidural steroid injection for plaintiff's lower back pain (Tr.
346-349).  Plaintiff returned to Dr. Adams on December 2, 2002
(Tr. 357).  She stated that she was working full duty, but the
constant duties of her job irritated her back so much that she
was in constant pain and wanted to apply for disability.  Dr.
Adams examined plaintiff and found that although she had limited
motion in her back, paraspinal muscle spasms, and pain during
motion of both shoulders, she had fairly good strength on testing
the rotator cuff, negative bilateral straight leg raises, and a
fairly normal gait.  Dr. Adams prescribed the narcotic Talwin for
the pain and wrote a note for plaintiff to be off work for four
weeks.  (Id.).

On December 17, 2002, Dr. Adams wrote that plaintiff
was disabled due to bilateral shoulder surgery and residual

---

[8]Compression of the back part of the leg behind the knee joint.
http://www2.merriam-webster.com/cgi-bin/mwmednlm.

14

weakness and pain in her shoulders which limited her ability to
work away from her body and overhead, and limited her ability to
lift and carry. Dr. Adams noted that plaintiff had a ten pound
lifting restriction and could not vacuum. He further noted that
due to a bulging disc, plaintiff would be limited in her ability
to sit for prolonged periods of time or bend or stoop on a
repetitive basis (Tr. 356).

Upon examination on December 23, 2002, Dr. Adams
diagnosed plaintiff with lumbar radiculopathy[9] and found that she
had some limited motion in her back and limited motion and pain
in her shoulders (Tr. 354). Dr. Adams also found plaintiff was
significantly disabled and would be unable to return to work (Tr.
354-355).

On January 17, 2003, Dr. Adams completed forms for the
Disability Determination Services (DDS) and noted that plaintiff
had normal gait and station, and essentially normal ROM in the
cervical spine, dorsolumbar spine and the shoulder (Tr. 351-353).
In addition, Dr. Adams observed that plaintiff had a negative
straight leg raise test and good strength, lateral bending and
extension in her lower extremities (Tr. 353).

On February 6, 2003, a state agency medical consultant,
Dr. Elena Perry, conducted a Residual Functional Capacity

---

[9]Disease of the nerve roots.
http://www2.merriam-webster.com/cgi-bin/mwmednlm.

Assessment (RFC) based upon the medical and non-medical evidence in the record. Dr. Perry found that plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk at least 6 hours in an 8 hour day, and sit for about 6 hours in an 8 hour day with limited upper extremity push/pull options - occasional above bilateral shoulders (Tr. 405-412). Dr. Perry further found that plaintiff had no postural limitations and occasional manipulative limitations in reaching bilaterally above the shoulders (Tr. 408). Dr. Perry noted that plaintiff was on numerous medications and thus appeared to have a low pain threshold (Tr. 410). Further, Dr. Perry noted that while plaintiff's treating physician, Dr. Adams, opined that plaintiff was disabled, a review of the objective medical findings revealed that determination to be too restrictive (Tr. 411).

On May 6, 2003, plaintiff called Dr. Armetta's office to request Flexeril for back spasms after sitting in a car for a long period of time (Tr. 459). On June 4, 2003, Dr. Armetta examined plaintiff based upon her complaints of dizziness, nausea, and headache. Diagnosed with a migraine, Dr. Armetta scheduled an MRI, continued plaintiff on current medications, and provided plaintiff with samples of those medications she could no longer afford. (Id.). The MRI showed no acute intracranial abnormality and the findings were suggestive of chronic sinusitis

16

(Tr. 456).

On September 26, 2003, plaintiff called Dr. Armetta with complaints of back pain (Tr. 453). During examination on October 16, 2003, Dr. Armetta opined that plaintiff's degenerative disc disease was causing her lower back pain that radiated down both legs (Tr. 452). During a December 22, 2003 examination, plaintiff complained that her back spasm was worse since the weekend. Dr. Armetta opined that plaintiff had cervical myositis, an inflammation of the neck muscle (Tr. 451).

On September 3, 2004, Dr. Adams completed a RFC assessment on plaintiff's behalf (Tr. 468-469). In the questionnaire, Dr. Adams opined that plaintiff could lift/carry a maximum of ten pounds, occasionally lift/carry less than ten pounds, frequently lift/carry less than ten pounds, stand up to 5 hours per day, walk up to 6 hours per day, sit for less than 4 hours per day, and had push/pull limitations due to the bilateral shoulder surgeries. In addition, Dr. Adams noted that plaintiff could rarely climb, occasionally balance, stoop, kneel, crouch and crawl, rarely reach and frequently grasp, feel, see and hear. (Id.).

### III.  Conclusions of Law

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.

17

<u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to

18

engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months." 42 U.S.C. § 423(d)(1)(A). At the administrative level
of review, the claimant's case is considered under a five-step
sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes
    substantial gainful activity, benefits are automatically
    denied.
(2) If the claimant is not found to have an impairment which
    significantly limits his or her ability to work (a "severe"
    impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment,
    it must be determined whether he or she suffers from one of
    the "listed" impairments[10] or its equivalent; if a listing
    is met or equaled, benefits are owing without further
    inquiry.
(4) If the claimant does not suffer from any listing-level
    impairments, it must be determined whether the claimant can
    return to the job he or she previously held in light of his
    or her residual functional capacity (e.g., what the claimant
    can still do despite his or her limitations); by showing a
    medical condition that prevents him or her from returning to
    such past relevant work, the claimant establishes a <u>prima
    facie</u> case of disability.
(5) Once the claimant establishes a <u>prima</u> <u>facie</u> case of
    disability, it becomes the Commissioner's burden to
    establish the claimant's ability to work by proving the
    existence of a significant number of jobs in the national
    economy which the claimant could perform, given his or her
    age, experience, education, and residual functional
    capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

        The Commissioner's burden at the fifth step of the

_____

        [10]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

evaluation process can be carried by relying on the medical-
vocational guidelines, otherwise known as "the grid," but only if
the claimant is not significantly limited by a nonexertional
impairment, and then only when the claimant's characteristics
identically match the characteristics of the applicable grid
rule.  Otherwise, the grid can not be used to direct a
conclusion, but only as a guide to the disability determination.
Id.  In such cases where the grids do not direct a conclusion as
to the claimant's disability, the Commissioner must rebut the
claimant's prima facie case by coming forward with particularized
proof of the claimant's individual vocational qualifications to
perform specific jobs, which is typically obtained through
vocational expert (VE) testimony.  See Varley v. Sec'y of Health
& Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

        In determining residual functional capacity (RFC) for
purposes of the analysis required at steps four and five above,
the Commissioner is required to consider the combined effect of
all the claimant's impairments, mental and physical, exertional
and nonexertional, severe and nonsevere.  See 42 U.S.C. §
423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

                C.   Plaintiff's Statement of Errors

        Plaintiff argues that the ALJ erred in (1) discounting
the opinion of her treating orthopedic surgeon, Dr. Adams,
without giving good reasons for doing so; (2) finding that her

                                  20

hand tremors were not a severe impairment under the regulations; and (3) relying on VE testimony in response to a hypothetical question which did not include all of plaintiff's limitations. Having reviewed the motion papers and the administrative record, the undersigned must conclude that the ALJ did indeed commit reversible error.

Plaintiff's arguments revolve around the ALJ's handling of her treating physicians' opinions, in particular that of her orthopedic surgeon, Dr. Adams. Dr. Adams has treated plaintiff since 1997, and has performed rotator cuff surgery on both of plaintiff's shoulders. On December 17, 2002, Dr. Adams submitted a letter stating his opinion regarding plaintiff's disability, as follows:

> Diane is considered disabled at this time because she has had bilateral shoulder surgery. She still has residual weakness and pain in her shoulders, which limits her ability to work away from her body and overhead. It also limits how much lifting and carrying she can do. I have her on a permanent ten lbs. lifting restriction and no vacuuming. She also has problems with her back. She also has very limited motion of her back. As the result of a bulging disc documented on MRI, this would limit her ability to sit for prolonged periods of time and also bending and stooping on a repetitive basis. She would be very limited again with lifting as a result of this as well.

(Tr. 356). In September 2004, Dr. Adams opined that plaintiff was limited to 4 hours of sitting, 5 hours of standing, and 6 hours of walking in an eight-hour day; that she could lift a maximum of 10 pounds, but could not do so frequently or even

21

occasionally; that her ability to push and/or pull was limited by residual pain and weakness from bilateral shoulder surgery; that she could occasionally balance, stoop, kneel, crouch, and crawl, but only rarely climb; and that she could frequently grasp but rarely reach (Tr. 468-69). After summarizing Dr. Adams' treatment records, as well as the records of treating physicians Drs. Ashley and Armetta and the assessment of the nonexamining state agency consultant, the ALJ gave the following consideration to Dr. Adams' opinion:

> The opinion of the claimant's residual functional capacity from Dr. Adams is not completely supported by the medical evidence. Therefore, he is not given controlling weight. Consideration has also been given to the reports of state agency medical consultants as well as to other treating, examining and non-examining medical sources.

(Tr. 16).

With all due respect, this handling of the treating specialist's opinion is patently deficient. In considering the opinion of a treating physician, an ALJ is required to give complete deference to the opinion if it is unopposed on the record; to give due deference to the opinion if it is opposed by other substantial medical evidence; and to give good reasons in support of any decision to discount the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(d). In the latter instance, the requirement of good reason giving is not merely a structural rule of opinion writing, but inures to the benefit of

22

the claimant by providing a substantial procedural protection, the failure of which is not generally subject to harmless error analysis. <u>Wilson v. Comm'r of Soc. Sec.</u>, 378 F.3d 541, 545-48 (6th Cir. 2004). The ALJ must therefore make explicit his reasoning when discounting a treating physician's opinion, and the reasoning itself must withstand scrutiny. <u>See</u> Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996)(stating that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

In this case, the ALJ correctly determined that Dr. Adams' opinion was not entitled to complete deference, but failed to articulate any reason for rejecting nearly all of Dr. Adams' findings as to plaintiff's exertional capabilities. The government argues otherwise, stating as follows:

> Contrary to plaintiff's assertion, the ALJ did, in fact, discuss and explain his reasons for not giving controlling weight to the opinions of Dr. Adams, Dr. Armetta and Dr. Talpos-Reed. *The ALJ specifically found that the opinions of Dr. Adams dated December 17, 2002 and September 3, 2004 (Tr. 356, 468-469), and that of Dr. Talpos-Reed dated June 29, 2000, and that of Dr. Armetta dated September 26, 2003 (Tr. 451-452) were not persuasive and not supported by the medical evidence of record, including their own treatment records (Tr. 16).*

(Docket Entry No. 20 at 15)(emphasis added). The undersigned is

23

puzzled about the basis for the government's position. Nothing in the way of what is described above appears at page 16 of the administrative record, nor, quite frankly, at any other page of the ALJ's decision.

While the ALJ did discount Dr. Adams' RFC assessment as being "not completely supported by the medical evidence," he did not identify with particularity the inconsistent medical evidence, except by citing evidence dated *before* plaintiff's alleged onset of disability, showing what appeared to be her successful rehabilitation from shoulder injuries and surgeries (Tr. 14). The ALJ also surmises that plaintiff's shoulder pain was not severe enough to require prescribed pain medication, since she alleged that Dr. Adams' pain medication prescriptions were for her back pain, not shoulder pain. However, even if these factors were sufficient to justify the rejection of Dr. Adams' restrictions on account of plaintiff's pain, they would not detract from his December 2002 and September 2004 assessments of residual weakness in the shoulders limiting her ability to reach and work away from her body and overhead. (Tr. 356, 468-69).

The only medical opinion of record which is contrary to Dr. Adams' assessment of work-related limitations is the assessment of the nonexamining state agency consultant, Dr. Perry (Tr. 405-412), which the ALJ deemed an overestimate of

24

plaintiff's capacity to lift/carry, stand/walk, perform postural maneuvers, and endure environmental factors, but which nonetheless is cited as having been considered for its divergence from Dr. Adams' opinion.[11]  Contrary to defendant's statement that the ALJ specifically found Dr. Adams' opinion of December 17, 2002 to be unsupported by his own treatment notes and the evidence as a whole, that opinion was not even mentioned in the ALJ's decision except in the following remarks: "Dr. Perry reported that Dr. Adams stated that the claimant was disabled in 2002.  However, Dr. Perry reported that this was too restrictive based on the objective evidence of record."  (Tr. 15).  Unfortunately, Dr. Perry's conclusory statement cannot serve to illuminate the reasoning of the ALJ.

Regarding Drs. Talpos-Reed and Armetta, it does not appear that the referenced "opinions" which the government states were specifically found unpersuasive are opinions at all.  The opinion ascribed to Dr. Talpos-Reed, dated June 29, 2000, is a treatment note wherein plaintiff was diagnosed with essential tremor and provided medication, based on the specialist's

---

[11]While Dr. Perry assessed a capacity for a range of light work, the ALJ determined that plaintiff's RFC was for a range of sedentary work, while defining the range based in part on the opinions of Dr. Perry (Tr. 16).  The assessment of Dr. Adams was also for a range of sedentary work (Tr. 15), but with differences in strength and postural limitations that proved significant. Specifically, the VE testified that the sedentary audit clerk job required six hours of sitting and (as generally performed in the economy) would not be available if plaintiff were limited to occasional bilateral reaching, but only if she were able to reach in all directions except overhead on a frequent basis (Tr. 521, 523).

neurological examination finding of "fine tremor on finger-to-nose and positional tremor" (Tr. 314). In the first place, this is not a medical opinion which the ALJ is empowered to credit or discredit, 20 C.F.R. § 404.1527(a)(2), but rather a medical sign -- that is, a physiological abnormality which was observed apart from plaintiff's subjective symptoms. 20 C.F.R. § 404.1528(b). Secondly, the ALJ did not make any specific finding regarding the persuasiveness of this treatment note, nor did he even mention the note, Dr. Talpos-Reed, or her treatment relationship with plaintiff in his decision. Rather, it appears that the government bases its contention on the negative implication from the ALJ's statement that plaintiff's hand tremors "were not mentioned in the record prior to the hearing as a disabling condition[, h]er list of medications does not include anything prescribed for hand tremors[, and t]he tremors were not observable during the hearing." (Tr. 14). As further explained below, for purposes of determining plaintiff's functional limitations and their vocational consequences, these few observations by the ALJ do not withstand scrutiny in light the findings of Drs. Talpos-Reed and Armetta, even if the ALJ correctly determined the hand tremors to be nonsevere.[12] In any

---

[12]42 U.S.C. § 423(d)(2)(B) provides as follows:

In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social

26

event, it would appear that the government is mistaken in its description of the ALJ's rejection of the neurologist's "opinion" as inconsistent with her treatment records.

As to the referenced opinion of Dr. Armetta,[13] the ALJ made note of plaintiff's complaints to the internist, as well as the clinical findings of Dr. Armetta which tended to substantiate certain of those complaints (Tr. 14). The ALJ did not reject any assessment of Dr. Armetta, but found her treatment records less than instructive on the level of plaintiff's pain, since those records did not discuss the doctor's treatment plan for plaintiff's back impairments and resulting pain. Thus, the ALJ appropriately considered the evidence from Dr. Armetta for its weight in his analysis of the credibility of plaintiff's pain complaints,[14] there being no assessment of work-related

_____

Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

[13]The government refers to the discounted opinion of Dr. Armetta as being dated September 26, 2003, and as being located at pages 451-452 of the administrative record. However, the only record from Dr. Armetta's office dated September 26, 2003 is a note taken by a nurse or receptionist documenting plaintiff's telephone call, complaining of "really bad" back pain which was not helped by the prescriptions written by Dr. Adams (Tr. 453). While the ALJ did make reference to this telephone record in his decision, it appears that the government intended to highlight the ALJ's questioning of the usefulness of the actual physician's notes contained at pages 451-452 of the record, which bear dates in October and December of 2003.

[14]Curiously, the ALJ noted that "the claimant alleged that Dr. Armetta prescribed her medication for back spasms, not pain, on an as needed basis" (Id.). However, the undersigned questions the basis for this distinction, since muscle spasm is among the functional manifestations of pain which, when

limitations or opinion as to the extent of pain/disability to accept or reject.

In short, aside from a few remarks bearing more on the credibility of plaintiff's pain complaints than the worthiness of her physicians' opinions, the ALJ's decision essentially gave a very cursory recitation of the evidence and reached a conclusion that split the difference between the assessments of the longtime treating specialist and the nonexamining state agency consultant, without giving good reasons in support. This is inconsistent with the requirements of the regulations, 20 C.F.R. § 404.1527(d), and erroneous under the law of this circuit as defined in <u>Wilson v. Comm'r of Soc. Sec.</u>, 378 F.3d 541, 545-48 (6th Cir. 2004). The importance of this procedural safeguard is all the more evident in this case where the countervailing evidence is an assessment from a physician who did not even examine plaintiff, and whose assessment of plaintiff's work-related limitations was only accepted to an extent which would allow the performance of one of plaintiff's past relevant jobs.

Finally, as alluded to above, the undersigned concludes that the ALJ also erred in failing to address plaintiff's alleged hand tremors in his hypothetical to the VE. Regardless of

_____

appreciated by a doctor on examination, constitutes "[o]bjective medical evidence of pain, its intensity or degree[.]" <u>Hines v. Barnhart</u>, 453 F.3d 559, 564 (4th Cir. 2006); <u>see</u>, <u>e.g.</u>, <u>Van Winkle v. Comm'r of Soc. Sec.</u>, 29 Fed.Appx. 353, 2002 WL 193937, at *3 (6th Cir. Feb. 6, 2002)(unpublished opinion).

28

whether these tremors would constitute a severe impairment
standing alone, their existence is established by not only the
testimony of plaintiff and her husband, but also the prior
diagnoses of plaintiff's neurologist (Tr. 314) and internist (Tr.
384), and their functional impact must therefore be assessed.  42
U.S.C. § 423(d)(2)(B).  This impairment may be of particular
significance to plaintiff's performance of the audit clerk job,
given the Commissioner's acknowledgment of the impact of any loss
of manual dexterity on the availability of most sedentary jobs.
E.g., Soc. Sec. Rul. 83-14, 1983 WL 31254, at *2 ("[B]ilateral
manual dexterity is necessary for the performance of
substantially all unskilled sedentary occupations.").  The
undersigned would recommend that on remand, this impairment as
well as plaintiff's back and shoulder impairments receive further
consideration by a consultative examiner, if more recent records
from plaintiff's treating sources are insufficient to fully
inform the new administrative decision.

### IV.  Recommendation

        In light of the foregoing, the Magistrate Judge
recommends that plaintiff's motion for judgment be GRANTED, and
that the decision of the Commissioner be REVERSED and the cause
REMANDED for further administrative proceedings, to include
updating the medical record, ordering a consultative examination

29

if necessary, and rehearing of the matter.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 16th day of January, 2007.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

30